<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CRAIG A. DEVITO, PROVI I. DEVITO, GABRIELA K. DEVITO, DARYEN F. DEVITO, and JEREMY M. SCARBROUGH, | : : : : : : : | **Civil Action No. 13-6786 (SRC)** |
| Plaintiffs, | : | **OPINION** |
| v. | : : | |
| BOROUGH OF CALDWELL, SGT. MICHAEL PELLEGRINO, POLICE CHIEF JAMES H. BONGIORNO, and JOHN DOES 1-5, | : : : : : | |
| Defendants. | : : | |

**CHESLER**, District Judge

      This matter comes before the Court upon the motion for summary judgment filed by Defendants Borough of Caldwell, Sergeant Michael Pellegrino, and Police Chief James Bongiorno, pursuant to Federal Rule of Civil Procedure 56. Plaintiffs Craig DeVito, Provi DeVito, and Daryen DeVito[1] have opposed the motion. The Court has considered the papers filed by the parties. For the reasons that follow, the Court will deny Defendants' motion.

### I.    BACKGROUND

      This case concerns warrantless entries into the home of Plaintiffs Craig DeVito ("Mr. DeVito"), Provi DeVito, and their daughter Daryen DeVito ("Daryen"), by Borough of Caldwell

---

[1] Gabriela DeVito and Jeremy Scarbrough have voluntarily dismissed their claims.

police officers in the course of performing welfare checks on Daryen's son, then-three-year-old "JJ", at the request of JJ's father, Joseph Colon ("Colon").

The relevant facts are not in dispute. Daryen and Colon shared custody of JJ, pursuant to a court order, which required Daryen to take JJ to and from Colon's house on alternate weekends. According to Daryen, the arrangement worked until Colon moved to a town approximately 76 miles from her residence and she stopped transporting JJ because she did not have a car. As a result, Colon did not see JJ for weeks or months at a time. In retaliation, the DeVitos allege, Colon began to summon the Caldwell police to their residence almost every Friday night for several weeks by reporting concerns about JJ's wellbeing and asking officers to check on the child.[2] To incite these checks, Colon, variously, told the police that he was having "custody issues with the mother," was denied visitation, saw bruises on the child's body, and feared that the mother had plans to take the child out of state. (Baratz Decl. Ex. I.)

In response to each call from Colon, the Caldwell Police Department dispatched officers to the DeVito residence to perform a "welfare check" on JJ – officers generally drove to the residence, spoke with the family, and asked to ascertain that JJ was alright. Initially, the DeVitos allowed the police conducting these welfare checks to enter their home. Three weeks in a row, on October 27, 2012, November 2, 2012, and November 9, 2012, officers reported no basis to substantiate Colon's worries, noting that JJ was well; "healthy and in good spirits"; was observed "lying in his bed drinking a bottle and watching television . . . was well fed and cared for." (*Id.*) In sum, JJ was consistently fine.

---

[2] The police performed seven welfare checks in total, on October 27, 2012, November 2, 2012, November 9, 2012, November 16, 2012, November 23, 2012, November 30, 2012, and May 12, 2013.

The DeVitos, on the other hand, grew weary of the weekly intrusions and turned to their attorney, Ronald Brandmayr, Jr., for help.  On November 16, 2012, Plaintiffs state that Mr. Brandmayr informed the Caldwell Chief of Police James Bongiorno that Mr. DeVito would no longer let the police into his home without a warrant.  Although Chief Bongiorno did not recall this conversation during his deposition, in his interrogatories the Chief stated that he may have discussed this call with his lieutenants during weekly meetings, but did not specify the substance of the conversation.  (*Id.*)  Whatever instructions he may have provided, the welfare checks continued.  Two more, on November 16, 2012, and November 23, 2012, preceded the November 30, 2012, and May 12, 2013, unconsented, warrantless entries at issue in this litigation.

On Friday, November 30, Colon told police headquarters that he had not seen JJ in two months and that JJ had bruises on his body when Colon had last seen him.  Officer Matthew DeAngelo and Sergeant Michael Geary were dispatched to investigate.  DeAngelo arrived first, and without knocking, let himself into the family's home, allegedly believing that the family's duplex was a multiple-unit dwelling with common areas.  Daryen testified that she was in her room when she looked down the hall and saw a policeman, (likely Officer DeAngelo, although she did not recall his name,) standing on the second floor landing.  Daryen spoke with the officer until Mr. DeVito ran down from the third floor and ordered the police to leave.  Officers complied, reporting that "everything [was] in order at the residence."  (Baratz Decl. Ex. Q.)

After this incident, the Plaintiffs' attorney followed up on his November 16th phone call with a letter to Chief Bongiorno, complaining about the continued warrantless searches, and reiterating his demand for the Caldwell Police to cease and desist.  After receiving the letter, Chief Bongiorno testified that he reviewed the family's case file, but did not think that the Department could stop responding because it has "an obligation to act on welfare checks."  (Bongiorno Dep.

3

14:10-15:13.)  To confirm, Chief Bongiorno sought direction from counsel for the Borough of

Caldwell, Gregory Mascera, who affirmed that the police have no discretion in the matter.  In

relevant part, Mr. Mascera's letter to Plaintiffs stated that:

> Chief Bongiorno and all members of the Caldwell police department
> have an obligation and duty to act upon every welfare check request
> received by the Police Department.  No member of the police
> department has discretion over whether to act on a welfare check
> request. . . .
>
> No member of the Caldwell Police department has violated your
> client's civil rights, state, or constitutional rights.  Please convey to
> your client that the members of the Caldwell Police Department
> have no discretion in this situation.  The members of the Police
> Department therefore will continue to carry out their duty to protect
> the health and safety of the minor child whenever they are requested
> to do so.

(Baratz Decl. Ex. F.)[3]  Accordingly, Chief Bongiorno ordered his lieutenants and sergeants to

continue to investigate all subsequent welfare check requests at the DeVito residence, warning

them that, based on the letter from Mr. Brandmayr, they "may be faced with some resistance[.]"

(Bongiorno Dep. 15:20-16:5.)

Following the November 30, 2012, call, Colon took an approximately five-month break

from contacting the Caldwell Police.  In the intervening time, on April 19, 2013, the acting Essex

County prosecutor sent a memorandum to all county directors and chiefs of police, explaining,

among other issues, the law concerning home entry in the context of community caretaking

functions, as distinct from criminal investigations.  Summarizing a newly-issued New Jersey

Supreme Court decision in *State v. Vargas*, 213 N.J. 301 (N.J. 2013), which set forth the applicable

---

[3] Mr. Mascrera further suggested that Plaintiffs should instead direct their grievances to the Superior Court and request
an injunction to prevent Colon from making future welfare check requests.  (Baratz Decl. Ex. F.)  The family court
denied this relief, refusing to bar Colon from seeking help if he had a legitimate concern.  (Daryen Dep. 82:13-22.)
The judge's refusal to issue a blanket prohibition on Colon's ability to call the police does not affect the analysis of
the propriety of the police response to the specific facts at issue in this case on two specific days.

standard under both the United States and New Jersey Constitutions, the memorandum emphasized that warrantless entry into a residence is only justified where there are exigent circumstances, such as "an objectively reasonable basis to believe that an emergency [is] threatening life or limb," regardless of law enforcement's motive for entry.  (Baratz Decl. Ex. G.)  Chief Bongiorno read the memorandum, emailed it to the police force, and posted it on a daily-update board.

The Department's next relevant encounter with the family occurred in response to Colon's Mother's Day call, when he complained that he had not seen JJ in a week and a half, the Division of Youth and Family Services ("DYFS")[4] was investigating Daryen for child abuse (this investigation, Plaintiffs note, was also triggered by prompting from Colon,) and Daryen had plans to leave the state with JJ, in violation of the custody order.  Sergeant Michael Pellegrino and Officer William Roberts drove to the residence, where they encountered Craig DeVito, who told them to leave, pointing to a doormat, sent by his attorney just for such an occasion, that read "come back with a warrant."  Sergeant Pellegrino told Mr. DeVito that he needed to check on the welfare of JJ.  (DSOF ¶ 23.)  According to Mr. DeVito, when he emphasized that Sergeant Pellegrino had no permission to come in, no warrant, and no exigency, Defendant responded that "[h]e didn't care.  He was coming in."  (DeVito Dep. 85:9.)  Sergeant Pellegrino stated that as he was arguing with Mr. DeVito, Daryen came downstairs and told the officers that they could enter the residence. (Pellegrino Dep. 11:17-13:14.)  Plaintiffs deny that Daryen consented to the search, claiming that she was in the shower during the initial exchange.  (Daryen Dep. 70:20-71:9.)  In any event, the officers entered the house over Mr. DeVito's objections and proceeded to search for JJ until they confirmed that JJ was not home, then left to wait for the child to return.  As with all prior incidents,

---

[4] The agency is now named the Division of Child Protection and Permanency.

the police report stated that "Colon was advised that contact was made with his son and all [was] well."  (Baratz Decl. Ex. S.)

The DeVitos allege that the welfare checks have caused them psychological distress – they have testified to feeling increased fear, anxiety, depression, experiencing difficulty sleeping, and feeling uncomfortable at home.

## II.   DISCUSSION

### A.  Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)).  In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable

to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  It may not make credibility determinations or engage in any weighing of the evidence. *Anderson*, 477 U.S. at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir.2001), overruled on other grounds by *Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs*, 134 S.Ct. 773 (2014).  However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

**B.  Section 1983 Claim**

Plaintiffs brought this action against the Borough of Caldwell, Police Chief Bongiorno, and Sergeant Michael Pellegrino, alleging that the intrusions into their home by Officer Matthew DeAngelo and Sergeant Michael Geary on November 30, 2012, and Sergeant Michael Pellegrino and Officer William Roberts on May 12, 2013, violated their Constitutional rights under the Fourth Amendment.  Although Officer DeAngelo, Sergeant Geary, and Officer Roberts were not individually named as defendants, their conduct is relevant to Plaintiffs' claims of liability against Chief Bongiorno and the Borough of Caldwell.

Plaintiffs' right of action arises under 42 U.S.C. § 1983, which allows individuals to bring a suit for damages "against any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the United States Constitution or federal law." *Couden v. Duffy*, 446 F.3d 483, 491 (3d Cir. 2006). Defendants have filed a motion for summary judgment arguing that there were no underlying Fourth Amendment violations, Sergeant Pellegrino and Chief Bongiorno are entitled to qualified immunity, and the Borough of Caldwell is not vicariously liable for any violations that may have occurred. Defendants also assert that Plaintiffs are not entitled to actual or punitive damages.

Qualified immunity shields government officials from standing trial in Section 1983 suits unless their conduct has violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defense accounts for the fact that police officers operate in often "tense, uncertain, and rapidly evolving" circumstances, whose actions must be judged from the "on-scene perspective," not "the perfect vision of hindsight." *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005). Qualified immunity thus affords police officers the leeway to make reasonable mistakes in the course of performing their duties. It is a threshold inquiry in Section 1983 litigation. To evaluate whether qualified immunity applies, a court must first decide "whether the facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If so, then whether the right was clearly established. *Couden*, 446 F.3d at 492. In other words, whether, in the specific context of the case, "it would have been clear to a reasonable officer that his conduct was unlawful[.]" *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

8

### a. Fourth Amendment Violations

The Fourth Amendment safeguards "the privacy and security of individuals against arbitrary invasions by governmental officials." *Gillard v. Schmidt*, 579 F.2d 825, 827-28 (3d Cir. 1978) (quoting *Camara v. Mun. Court*, 387 U.S. 523, 528 (1967)). "Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 587 (1980) (quoting *Dorman v. United States*, 435 F.2d 385, 389 (D.C. Cir. 1970)). To enter a person's home, police officers must ordinarily have consent or seek a warrant based on probable cause. *See Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996). Warrantless entries are presumptively unreasonable. *Ray v. Twp. of Warren*, 626 F.3d 170, 174 (3d Cir. 2010). However, the exigencies of the situation may make the needs of law enforcement so compelling as to overcome this presumption. *Kentucky v. King*, 563 U.S. 452, 460 (2011). Such exigencies exist when officers are in hot pursuit of a fleeing suspect; reasonably believe that they must act to prevent the imminent destruction of evidence; or reasonably believe that someone is in imminent danger. *United States v. Mallory*, 765 F.3d 373, 384 (3d Cir. 2014).

Defendants state that the emergency aid exception justified the November 30, 2012, and May 12, 2013, entries. The emergency aid exception allows law enforcement officers to enter a home without a warrant "to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). To justify warrantless entry, the officers must have "an objectively reasonable basis for believing that a person within [the house] is in need of immediate aid[.]" *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (internal citations omitted). The key "is imminence–'the existence of a true emergency.'" *Mallory*, 765 F.3d at 384 (quoting *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011)). The present record shows

no evidence of an emergency, and thus no reasonable basis on which officers could have concluded that JJ's wellbeing was in jeopardy on the two days at issue.

The November 30, 2012, welfare check was precipitated by a report that JJ had bruises two months before and had not seen his father in the intermittent time period.[5]  The Third Circuit has considered analogous circumstances in *Good v. Dauphin County Social Services for Children and Youth*, 891 F.2d 1087 (3d Cir. 1989).  There, the court held that government officials were not justified in entering the plaintiff's home to investigate allegations of child abuse on the basis of a report, received at least twenty hours earlier, that the child had bruises from a fight with her mother. Noting that, upon their arrival at the scene, the officials observed no signs to suggest that the child was presently being mistreated, the court stated that: a single stale report of bruises of unspecified severity was "hardly a rational basis for a state actor to conclude that forced entry into the residence was required to protect [the child] from imminent harm."  *Id.* at 1095.

If twenty-hour old bruises are too stale to merit emergency action, two-month old bruises are even more so.  The fact that Colon had not seen JJ in two months likewise cannot reasonably support the existence of an emergency.  To the contrary, the two intervening months show that the circumstances could not have been so pressing that the police had no time to secure a warrant. And it is this very lack of time that transforms an unreasonable, and thus illegal, warrantless search, into a reasonable one.  *See Missouri v. McNeely*, 133 S. Ct. 1552, 1559 (2013).  No information given by Colon showed that JJ was in danger on November 30, 2012, when Officer DeAngelo and Sergeant Geary responded to Colon's request for a welfare check.  Nor does the record reflect that

---

[5] Upon arriving at the duplex where the DeVitos lived, Officer DeAngelo explained that he entered through an unlocked door into what he believed was a common area of a multiple unit dwelling or apartment building, and proceeded upstairs, ending up on the second floor of the family's home.  Defendants do not argue that a reasonable mistake of fact excused the Fourth Amendment violation, but rather that the exigency of the circumstances justified the entry.

anything upon arrival at the residence aroused the officers' suspicions of present danger.  Because the record shows no evidence of exigent circumstances, the Court cannot conclude that the entry into the Plaintiffs' residence during the November 30, 2012, welfare check was lawful.

The same is true for the May 12, 2013, entry by Officer Roberts and Defendant Sergeant Pellegrino, on information, as stated in the police report, that "Colon requested a welfare check for [JJ] as [Colon] hasn't had visitation in a week and a half. . . . [T]here is an open DYFS case involving [Daryen] allegedly abusing [JJ, and Daryen] has plans to leave the state with [JJ] which she is restricted from doing."  (Baratz Decl. Ex. S.)  Standing alone, these facts do not suggest that anything harmful was happening to JJ at the moment when Colon called.[6]  Again, there is no additional evidence of an exigency that could have necessitated entry, over Mr. DeVito's objections, to ensure that JJ was okay.[7]  The evidence on the record shows that, upon arrival, Sergeant Pellergrino knocked on the door and spoke with Mr. DeVito and, if Sergeant Pellegrino's testimony were credited, Daryen.  Defendants do not say that either person behaved suspiciously; do not identify any other suspicious activity; do not specify any sight, sound, smell, or indicia of anything being amiss.  In short, the record shows no evidence of an exigency that prevented Defendants from taking the time to secure a warrant if they believed that they had probable cause for entry.

---

[6] Even if the justification for entry were to impede Daryen from taking the child out of state rather than to render emergency aid, which the Defendants do not appear to claim was the case, there is no evidence that the plans were imminent, nor that it would have been necessary for the officers to enter Daryen's house to prevent her from leaving it.  Even in an emergency, the scope of a permissible search is limited by the nature and extent of the exigency.  *See Mallory*, 765 F.3d at 386-88.

[7] Sergeant Pellegrino testified that, while Mr. DeVito objected to his entry, Daryen allowed him to come in.  Daryen denies doing so.  Defendants do not rely on Sergeant Pellegrino's version of events to argue that he had permission to perform the May 12, 2013, search for JJ, but instead claim that the entry was lawful because of the emergency aid exception to the Fourth Amendment.  Defendants are right not to hinge their argument on this testimony as Daryen's consent is invalid as to Mr. DeVito, an occupant who was present and objected.  *See Georgia v. Randolph*, 547 U.S. 103, 120 (2006).

### b.  Clearly Established Law

Sergeant Pellegrino, the only responding police officer named as an individual Defendant, argues that he is entitled to qualified immunity, which protects him from Section 1983 liability unless his conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 U.S. at 818.  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  In other words, "existing precedent [must have] placed the statutory or constitutional question beyond debate."  *City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011)).  To determine whether existing case law provides such clear guidance, courts "look first for applicable Supreme Court precedent," and, if there is none, for a "'robust consensus of cases of persuasive authority' in the Court of Appeals[.]"  *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, -- F.3d --, 2016 WL 683637, at * 3 (Feb. 19, 2016) (quoting *Taylor v. Barkes*, 135 S.Ct. 2042, 2044 (2015)).  The examination "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Couden*, 446 F.3d at 495 (quoting *Saucier*, 533 U.S. at 201).  "The ultimate issue is whether . . . reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful."  *Good*, 891 F.2d at 1092.  "'If the officer's mistake as to what the law requires is reasonable,' the officer is entitled to qualified immunity."  *Couden*, 446 F.3d at 492 (quoting *Saucier*, 533 U.S. at 205).

The Supreme Court and the Third Circuit have left no doubt that warrantless entry into the home requires exigent circumstances.[8]  *See e.g.*, *Brigham City*, 547 U.S. at 403; *Mallory*, 765 F.3d at 382.  If police officers need to access a residence out of concern for an occupant's welfare, the officers must "reasonably . . . believe that someone is in *imminent danger*."  *Parkhurst*, 77 F.3d at 711 (emphasis in original).  Defendants agree that under the emergency aid exception the police must "have reasonable grounds to believe that there is an emergency relating to the protection of life or property[.]"  (Defs.' Br. at 18.)  The Third Circuit has further cautioned that allegations of past child abuse do not support a reasonable belief of imminent harm to the child.  *See Good*, 891 F.2d at 1095.  Plaintiffs' rights, on these facts, were sufficiently clear.  On the record before the Court, Sergeant Pellegrino entered Plaintiffs' home on the basis of information provided by Colon that did not reveal any harm befalling JJ at the time of Colon's call.  No additional evidence shows that officers witnessed anything upon arriving at the residence that may have alchemized Colon's generalized concerns about his son into indicia of an imminent threat.  Without such an exigency, it should have been clear to a reasonable officer that the intrusion that occurred here could not have been legally justified.[9]

---

[8] Viewing the facts in a light most favorable to the Plaintiffs, Sergeant Pellegrino did not have permission to enter the family's home, and even if Daryen allowed entry, her consent, absent exigent circumstances, was not sufficient to override Mr. DeVito's objections.  *See Randolph*, 547 U.S. at 120.  Thus, the only issue is whether Sergeant Pellegrino could have reasonably concluded that exigent circumstances justified the entry.

[9] Defendants marshal several cases to support their contentions that reasonable officers could have concluded that an exigency justified entry.  However, Defendants miss that, in each of those cases, the police officers have relied on contemporaneous evidence to demonstrate a reasonable belief that a present threat may have existed.  For example, in *Leenstra v. Then*, officers entered the Plaintiff's home to verify her wellbeing because she had a history of mental illness and texted her therapist, asking if that day was a good day "is die.  2013 WL 663313, at * 7 (D. N.J. Feb. 21, 2013).  In *State v. Frankel*, 847 A.2d 561, 574 (N.J. 2004), the police responded to a dropped 9-1-1 call, after attempting to call the number back and getting a busy signal.  Although the home occupant denied that anyone called, the police did not find her statement to be credible because he was visibly nervous, agitated, and was stumbling over his words.  On this basis, officers concluded that a victim who made the call may have been inside the house.  In *State v. Edmonds*, the police were notified that a woman's boyfriend "is beating her up and got a gun."  47 A.3d 737, 740 (N.J. 2012).  Thus, when deciding to enter the home over the objections of the alleged victim to ensure that her eleven-year-old son was safe, officers did so in the context of a presently perceived threat.  Even in *Martin v. City of Oceanside*, where officers responded to the call of a concerned father who had not heard from his daughter for several

13

Although the inquiry is objective, it is worth mention that before the May 12, 2013, incident, Sergeant Pellegrino received a memorandum, forwarded by Chief Bongiorno, explaining that exigent circumstances are required for warrantless entry into a home, even where the entry is motivated by a desire to assist the occupant.  (Baratz Decl. Ex. G) (discussing *State v. Vargas*, 213 N.J. 301 (N.J. 2013), New Jersey Supreme Court decision explaining the standard, under the United States and New Jersey State Constitutions, for police entry in the context of executing community caretaking functions).  Yet, Sergeant Pellegrino's testimony suggests that he does not understand the law to constrain his ability to enter a home to an emergency when a welfare check of a minor is involved:

> Q.      Let's say you are dispatched to a home because the father of a child wants a welfare check on the baby. . . . You go to the home, the owner of the home meets you at the door. . . . And you say, may I enter the house to look on the child and he says no. What is your understanding of your obligation at that point?

> A. Well, based on the nature of the call . . . I need to check on the welfare of a minor, I'm going to go into the residence.

(Pellegrino Dep. 9:19-10:6.)  The law, however, does not provide the police *carte blanche* rights to protect the welfare of minors.  *See Goodman*, 891 F.2d at 1094 ("The Fourth Amendment caselaw has been developed in a myriad of situations involving very serious threats to individuals and society, [with] no suggestion . . . that the governing principles should vary depending on the court's assessment of the gravity of the societal risk involved.").  Such an exception would eviscerate Fourth Amendment protections and could not have been reasonably presumed to exist.

---

days, officers entered the home because their observations at the scene led them to believe that a crime may have been in progress.  205 F. Supp. 2d 1142, 1145 (S.D. Cal. 2002).  Here, on the other hand, there is no evidence that JJ was in present danger when Sergeant Pellegrino responded to Colon's request for a welfare check.  The available evidence instead suggests that the mere request for a welfare check may have provided Sergeant Pellegrino with sufficient justification to enter.  (*See* Pellegrino Dep. 10:1-6.)

Accordingly, Sergeant Pellegrino is not entitled to qualified immunity from Plaintiffs' Section 1983 claims.

### c.  Liability of Chief Bongiorno

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  *Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  To face liability, supervisors must have personal involvement in the alleged wrongs.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).  Personal involvement can be shown if a supervisor "'participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced' in the subordinate's unconstitutional conduct."  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) (quoting *A.M. ex rel. J.M.K. v. Lezerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)), cert. granted, judgment rev'd sub nom. on other grounds by *Taylor v. Barkes*, 135 S. Ct. 2042 (2015).  Government officials can also be liable for establishing or maintaining a policy, practice, or custom that directly causes a deprivation of constitutional rights with deliberate indifference to the consequences.  *See Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 724-25 (3d Cir. 1989).  "'Failure to' claims—failure to train, failure to discipline, or . . . failure to supervise—are generally considered a subcategory of policy or practice liability."  *Barkes*, 766 F.3d at 316.[10]

---

[10] *Iqbal*, holding that a plaintiff could not proceed against high level government officials on the basis of knowledge and acquiescence in discriminatory conduct on the basis of race, religion, or national origin, absent showing that defendants developed the policies at issue for the purpose of discrimination, did not "abolish[] supervisory liability[.]" *Barkes*, 766 F.3d at 319.  Rather, under *Iqbal*, supervisors remain liable for their own misconduct in creating a constitutional violation when acting with "the level of intent necessary to establish . . . the underlying constitutional tort alleged." *Id.*

15

Plaintiffs have produced enough evidence of Chief Bongiorno's personal involvement to survive summary judgment. After receiving a letter from Plaintiffs' Counsel demanding an end to the warrantless welfare checks performed by the Caldwell police, Chief Bongiorno testified that he reviewed the family's file, which would have revealed six ultimately unsubstantiated complaints from Colon about JJ's wellbeing that triggered the welfare checks, including one resulting in a warrantless, unconsented entry by a police officer into the Plaintiffs' home. (Baratz Decl. Exs. E, I; Bongiorno Dep. 14:17-18.) Nevertheless, the Chief, upon consulting with the Borough attorney, instructed his subordinates to continue investigating the DeVito residence whenever a welfare check is requested, without addressing the legal limitations on entry. (Baratz Decl. Ex. I; Bongiorno Dep. 17:1-8.) Chief Bongiorno's responses to Plaintiffs' interrogatories suggest that he may have given similar instructions after the November 16, 2012, conversation with Plaintiffs' counsel, during which Mr. Brandmayr states that he told the Chief that the family would no longer allow Caldwell police officers to come into their house.

There is further evidence that could support an affirmative link between the Chief's instructions and Sergeant Pellegrino's conduct on May 12, 2013. Sergeant Pellegrino recalled receiving Chief Bongiorno's email directing the Department to conduct on-demand welfare checks at the DeVito residence. (Pellegrino Dep. 21:1-8.) Sergeant Pellegrino then testified that the need to check on the welfare of a minor allows him to enter a home over an occupant's objections. (Pellegrino Dep. 10:1-6.) Although Chief Bongiorno denied that an order to perform welfare checks equated to authorization for unconsented home entry in the absence of exigent circumstances, the Chief did not provide such clarification to his officers when directing them to

continue conducting welfare checks at the DeVito residence.[11]  (Bongiorno Dep. 17:9-18:6, 20:7-21:17.)  Viewing the record in a light most favorable to the Plaintiffs, Plaintiffs have presented sufficient evidence to raise an issue of material fact concerning the Chief's liability for the warrantless searches that occurred on November 30, 2012, and May 12, 2013.[12]

The Chief's reliance on the advice of the Borough's attorney, Gregory Mascera, confirming that members of the Caldwell Police Department "have an obligation and duty to act upon every welfare check request received," does not preclude liability where the law left no ambiguity that exigent circumstances must exist to allow law enforcement entry into a residence, even for a welfare check on a minor child.  (Baratz Decl. Ex. F); *see Woodwind Estates, Ltd. v. Gretkowski*, 205 F.3d 118, 125 (3d Cir. 2000), abrogated by *United Artists Theatre Circuit, Inc. v. Twp. of Warrington* on other grounds, 316 F.3d 392 (3d Cir. 2003).  Because this law was clearly established when the incidents occurred, Chief Bongiorno is not entitled to qualified immunity.

### d.  Liability of the Borough of Caldwell

Finally, Plaintiffs claim that the Borough of Caldwell is liable because the illegal searches were performed in the course of executing a municipal policy or custom.  In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court outlined the

---

[11] Chief Bongiorno testified that:

> [Entry] wasn't discussed. . . . I . . . just let them know they may be faced with some resistance from the family based on this letter, but we do obviously need to follow through and investigate the well-being of the child. . . . Obviously they would act professionally . . . and conduct an investigation, wherever that investigation may lead. . . . [If a resident denies entry], the officer at that point is not allowed to force his way into the house.  But if there's an exigen[t] circumstance, does he hear crying, is there a child yelling for help.  What are all the circumstances involved.  If there's nothing in the background and the officer is outside and the resident's saying there's no child here and nothing is going on, then the officer would have to take him at his word for that.

(Bongiorno Dep. 17:7-23, 21:4-17.)

[12] The parties do not discuss the effect of distributing the *Vargas* memorandum, which describes the proper standard for home entry, to subordinates.  Its impact, in any case, is a question of fact for trial.

requirements for municipal liability under Section 1983.  Municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of.  *Id.* at 694.  As with supervisory liability, liability cannot be predicated solely on the operation of *respondeat superior.  Natale v. Camden County Corr. Facility,* 318 F.3d 575, 583-84 (3d Cir. 2003).  To successfully bring a *Monell* claim, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  A policy is made "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law."  *Brown,* 520 U.S. at 404.  In addition to identifying conduct attributable to the municipality, "[t]he plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  *Id.*  That is, a plaintiff must "demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

Plaintiffs have presented sufficient evidence on the basis of which a trier of fact could find the existence of a policy and a link between the policy and the searches that occurred.  Mr. Mascera's letter to Plaintiffs outlined what a reasonable jury could construe as a Borough policy on welfare checks: "all members of the Caldwell police department have an obligation and duty to act upon every welfare check request received by the Police Department.  No member of the police department has discretion over whether to act . . . . " (Baratz Decl. Ex. F.)  On the basis of this

directive, Chief Bongiorno told his subordinates to continue performing welfare checks at the Plaintiffs' residence without discussing any limitations on entry, notwithstanding Plaintiffs' complaints. Sergeant Pellegrino cited an obligation to ascertain the welfare of minors to justify entering Mr. DeVito's home without a warrant, consent, or evidence of an exigency to permit such entry, testifying that if "I need to check on the welfare of a minor, I'm going to go into the residence." (Pellegrino Dep. 9:19-10:6.) From this conduct, a reasonable jury could establish a link between the alleged policy and the alleged violations of Plaintiffs' civil rights. The Borough of Caldwell is thus not entitled to summary judgment.

### e. Damages

Plaintiffs allege that as a result of Defendants' repeated disturbances of their privacy, they have suffered psychological trauma. Plaintiffs also demand punitive damages. Defendants argue that Plaintiffs' emotional injuries are not compensable because they do not stem from conduct that is so extreme or outrageous in character as to exceed all bounds of decency; nor do the violations merit an award of punitive damages.

Contrary to Defendants' contentions, Plaintiffs' right to recover for psychological injury in the civil rights context is not governed by the standard imported from intentional infliction of emotional distress torts. "[C]ivil rights laws are intended in part to provide broad, consistent recompense for violations of civil rights." *Bolden v. Southeastern Pa. Transp. Auth.*, 21 F.3d 29, 35 (3d Cir. 1994) (citing *Basista v. Weir*, 340 F.2d 74 (3d Cir. 1965)). Non-pecuniary emotional damages can be recovered under Section 1983 as long as the Plaintiff can show actual injury. *Carey v. Piphus*, 435 U.S. 247, 263-64 (1978); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) ("compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . . , personal humiliation, and

19

mental anguish and suffering.'") (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)). The requirement for actual injury serves merely to caution that injury may not be inferred solely from the fact that a constitutional right was violated. *See Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1121-22 (3d Cir. 1988). It does not impose a threshold for a particular quantum or degree of harm.

Moreover, emotional damages do not have to be supported by any specific kind of evidence. *Bolden*, 21 F.3d at 36. Expert medical testimony is not required. *Id.* Instead, emotional distress can be proven "by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Carey*, 435 U.S. at 263-64. Such injury "may be evidenced by one's conduct and observed by others." *Id.* at 264 n.20. Accordingly, plaintiff's own testimony or the testimony of family members can be used to support recovery for emotional distress. *See Bolden*, 21 F.3d at 33; *cf. Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 236 (8th Cir. 1976) (plaintiff's testimony that she was "embarrassed" and "really hurt and humiliated" may support claim for emotional distress damages). Plaintiffs have complained of increased fear and anxiety, difficulty sleeping, depression, and feeling uncomfortable in their home. This evidence is sufficient to allow the jury to determine whether Plaintiffs' allegations of emotional distress constitute a compensable injury.

Plaintiffs have also shown sufficient evidence based on which a jury may award punitive damages. Punitive damages may be warranted where a defendant acts with reckless or callous disregard for the plaintiff's rights, or intentionally violates federal law. *Smith v. Wade*, 461 U.S. 30, 51 (1983). Defendants' conduct does not need to be driven by evil motive or intent. *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989). The present record can support a conclusion that responding police officers, without a warrant or evidence that JJ was in immediate need of help, entered Plaintiffs' home without their permission. From there, a reasonable jury could find that a clear violation of Plaintiffs' Fourth Amendment rights occurred. Punitive damages, however, are

not available against the Borough of Caldwell. *City of Newport v. Fact Concerts*, *Inc.*, 453 U.S.

247, 271 (1981) (punitive damages are not available against a municipality in an action under 42

U.S.C. § 1983).

**III.   CONCLUSION**

For the foregoing reasons, the Court will **DENY** Defendants' motion for summary

judgment.  An appropriate Order will be filed.


        s/ Stanley R. Chesler
        STANLEY R. CHESLER
        United States District Judge


Dated:  March 23, 2016